UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: 100% GRATED PARMESAN CHEESE MARKETING AND SALES PRACTICES LITIGATION | ) ) ) ) | 16 C 5802 MDL 2705 |
|  | ) | Judge Gary Feinerman |
| This Document Relates to All Cases | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendants in this multidistrict litigation are purveyors of grated parmesan cheese products with labels stating "100% Grated Parmesan Cheese" or some variation thereof. Plaintiffs allege that they were misled by the labels because the products contain ingredients other than cheese—in particular, a nontrivial amount of cellulose. After the Judicial Panel on Multidistrict Litigation consolidated these suits before the undersigned judge, Doc. 1, Plaintiffs filed five consolidated class action complaints, which allege violations of various state consumer protection statutes, breaches of express and implied warranty, and unjust enrichment. Docs. 120-123, 143. Defendants move to dismiss the complaints under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Docs. 156, 160, 163, 167, 173. The Rule 12(b)(1) motions are denied, but the Rule 12(b)(6) motions are granted.

**Background**

On a facial challenge to subject matter jurisdiction under Rule 12(b)(1) or a motion to dismiss under Rule 12(b)(6), the court assumes the truth of the operative complaints' factual allegations, though not their legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (Rule 12(b)(6)); *Apex Dig. Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009) (Rule 12(b)(1)). The court must also consider "documents attached to the complaint[s], documents that are critical to the complaint[s] and referred to in [them], and

1

information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). Where a complaint attaches only part of a relevant document, the court may consider the entire document if the defendant appends it to its motion. *See Rosenblum v. Travelbyus.com*, 299 F.3d 657, 661-62 (7th Cir. 2002) (holding that the court could consider the remainder of a contract referenced in the complaint, where the plaintiff "appended only a part of the relevant instrument" and the defendant attached the rest). The facts are set forth as favorably to Plaintiffs as those materials allow, and all reasonable inferences are drawn in their favor. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

Defendants The Kraft Heinz Company, Albertsons Companies, Inc. and Albertsons LLC (together, "Albertsons"), Supervalu, Inc., Target Corporation, Wal-Mart Stores, Inc., ICCO-Cheese Company, Inc., and Publix Super Markets, Inc. design, develop, manufacture, sell, test, package, label, distribute, promote, market, and/or advertise grated parmesan cheese products. Doc. 120 at ¶¶ 16-17; Doc. 121 at ¶¶ 10-14; Doc. 122 at ¶¶ 11-12; Doc. 123 at ¶¶ 13-14; Doc. 143 at ¶ 9. The products all bore labels stating "100% Grated Parmesan Cheese," Doc. 120 at ¶¶ 7, 9-15; Doc. 121 at ¶¶ 7-9; Doc. 122 at ¶¶ 7-11; Doc. 123 at ¶¶ 7-12, or some similar variation, Doc. 120 at ¶ 8 ("100% Grated Parmesan and Romano Cheese"); Doc. 122 at ¶¶ 7-8, 10 ("Parmesan 100% Grated Cheese"); Doc. 123 at ¶¶ 7-12 ("100% Parmesan Grated Cheese"); Doc. 143 at ¶ 7 ("100% Real Grated Romano Parmesan Cheese"); *id.* at ¶ 8 ("100% Real Grated Parmesan Cheese"); *see also* Doc. 120 at ¶ 20 ("100% Grated Three Cheese Blend"). In

2

addition, Kraft "developed and paid for [television commercials] throughout the years and the class period [which] reinforced the message that the Products are comprised of only 100% real cheese." Doc. 120 at ¶ 21.

Plaintiffs are consumers who purchased Defendants' products at grocery stores around the country. Doc. 120 at ¶¶ 7-15; Doc. 121 at ¶¶ 7-9; Doc. 122 at ¶¶ 7-10; Doc. 123 at ¶¶ 7-12; Doc. 143 at ¶¶ 7-8. Plaintiffs purchased the products believing that they contained only cheese, and nothing else. Doc. 120 at ¶¶ 7-15; Doc. 121 at ¶¶ 7-9; Doc. 122 at ¶¶ 7-10; Doc. 123 at ¶¶ 7-12; Doc. 143 at ¶¶ 7-8. The products, however, contain not just cheese, but also anywhere from 3.8% to 8.8% cellulose, an organic polymer with no nutritional value that is "often used as a filler." Doc. 120 at ¶¶ 19, 22 (complaint against Kraft, alleging 3.8% cellulose); Doc. 121 at ¶¶ 16, 18 (complaint against Albertsons and Supervalu, alleging 8.8% cellulose); Doc. 122 at ¶¶ 16, 18 (complaint against Target and ICCO, not specifying a percentage); Doc. 123 at ¶¶ 17-18, 20 (complaint against Wal-Mart and ICCO, alleging 7.8% cellulose); Doc. 143 at ¶¶ 11, 13 (complaint against Publix, alleging "a significant portion" of cellulose). Some of the products also contained other ingredients, including potassium sorbate, Doc. 120 at ¶ 19; Doc. 122 at ¶ 16; Doc. 123 at ¶ 18, and corn starch, Doc. 122 at ¶¶ 15-16.

Each product has an ingredient list somewhere on its label, and each ingredient list disclosed the non-cheese ingredients. Doc. 157 at 11-12; Doc. 162 at 14; Doc. 164-1; Doc. 168-1; Doc. 174 at 8. While "100% Grated Parmesan Cheese" (and the other, similar descriptions) are prominently featured on the products' front labels, the ingredient lists are smaller, less conspicuous, and located near the nutritional facts on the rear labels. Doc. 157 at 11-12; Doc. 162 at 14; Doc. 164-1; Doc. 168-1; Doc. 174 at 8. Each ingredient list states that the cellulose is

added "to prevent caking." Doc. 157 at 11-12; Doc. 162 at 14; Doc. 164-1; Doc. 168-1; Doc. 174 at 8.

As a representative example, Kraft's "100% Grated Parmesan Cheese" packaging includes, on the back of the container, the following list in a relatively small, all-capital-letters font: "Ingredients: Parmesan Cheese (pasteurized part-skim milk, cheese culture, salt, enzymes), cellulose powder to prevent caking, potassium sorbate to protect flavor." Doc. 162 at 14. The "100% Grated Parmesan Cheese" description is featured prominently on the front label. *Ibid*. The packaging advises purchasers to "refrigerate after opening," *ibid*., plainly indicating that the unopened product is shelf-stable and need not be refrigerated.

The following images show the products' general appearance and the labels' layout and design.

 

Doc. 162 at 14 (Kraft).



Doc. 168-1 at 2 (Wal-Mart and ICCO).



Doc. 174 at 8 (Publix).

5



Doc. 157 at 12 (Albertsons and Supervalu).



Doc. 164-1 at 2 (Target and ICCO).

**Discussion**

Defendants seek dismissal under Rule 12(b)(1) for lack of Article III standing and under

Rule 12(b)(6) for failure to state a claim.  Because standing is jurisdictional, the court must

consider it before reaching the merits.  *See Hinrichs v. Speaker of House of Representatives of*

*Ind. Gen. Assembly*, 506 F.3d 584, 590 (7th Cir. 2007).

## I.    Article III Standing

Defendants assert that Plaintiffs do not adequately plead two necessary components of

Article III standing, injury and causation.  Doc. 164 at 23-25.  The Supreme Court recently

reiterated the requirements for Article III standing:

> [T]he irreducible constitutional minimum of standing consists of three
> elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is
> fairly traceable to the challenged conduct of the defendant, and (3) that is
> likely to be redressed by a favorable judicial decision.  The plaintiff, as the
> party invoking federal jurisdiction, bears the burden of establishing these
> elements.

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations and internal quotation marks

omitted); *see also Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016)

("[Plaintiffs] must demonstrate that they have 'suffered a concrete and particularized injury that

is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial

decision.'") (quoting *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013)).

Plaintiffs' alleged injuries are financial.  They claim that they purchased a product worth

less than what they paid because it contained non-cheese ingredients, and also that they received

something different—and less valuable—than what they were promised, because the front label

misleadingly states that the product is 100% cheese.  Doc. 120 at ¶ 24; Doc. 121 at ¶ 20; Doc.

122 at ¶ 20; Doc. 123 at ¶ 22; Doc. 143 at ¶ 15.  For the reasons given in *In re Aqua Dots*

*Products Liability Litigation*, 654 F.3d 748 (7th Cir. 2011), these allegations are sufficient to establish standing.

The plaintiffs in *Aqua Dots* sued the manufacturer and distributors of a children's toy consisting of little beads that could be fused together to create designs. *Id*. at 749. When swallowed, a chemical in the beads metabolized into gamma-hydroxybutyric acid, commonly known as the "date rape" drug. *Ibid*. Children who swallowed a large number of beads became sick, with some falling into comas. *Id*. at 749-50. The plaintiffs were not physically injured children or their parents, but instead were the parents of children who suffered no physical injury. *Id*. at 750. The Seventh Circuit held that the plaintiffs had Article III standing. According to the court, the fact that the plaintiffs "did not suffer physical injury, … [did] not mean that they were uninjured. The plaintiffs' loss is financial: they paid more for the toys than they would have, had they known of the risks the beads posed to children. A financial injury creates standing." *Id*. at 751; *see also United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686 (1973) (noting that "those who could show economic harm" have standing) (citation omitted).

The same result obtains here. The complaints allege, among other things, that Plaintiffs overpaid for Defendants' products because the non-cheese ingredients made the products less valuable than what they cost. Doc. 120 at ¶ 24; Doc. 121 at ¶ 20; Doc. 122 at ¶ 20; Doc. 123 at ¶ 22; Doc. 143 at ¶ 15. As in *Aqua Dots,* that is sufficient to establish standing. *See Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 986-87 (N.D. Ill. 2013) (holding that the plaintiff had standing where she alleged that she paid a premium for a diaper-disposal product based on the false representation that it had been "Proven #1 in Odor Control"); *Lipton v. Chattem, Inc.*, 2012 WL 1192083, at *3-4 (N.D. Ill. Apr. 10, 2012) (same, where the plaintiff alleged that she paid

8

more for a weight loss product than she would have paid had she known that it contained

hexavalent chromium); *Askin v. Quaker Oats Co.*, 818 F. Supp. 2d 1081, 1084 (N.D. Ill. 2011)

(same, where the plaintiff alleged that she paid a premium for a food product based on the

defendant manufacturer's false representations that the product did not contain unhealthy trans

fats); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124-25 (N.D. Cal. 2010) (same);

*Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1240-41 (D. Kan. 2007) (same, where the

plaintiff alleged that she paid more for beverages than they were worth because they potentially

contained benzene).  And if Plaintiffs are correct that Defendants' labels are misleading, then the

complaints—which assert that Plaintiffs viewed the allegedly misleading labels and formed a

belief that the products contained only cheese—provide an adequate basis to conclude that the

challenged conduct caused their injuries.  *See Muir*, 983 F. Supp. 2d at 991 (holding that the

plaintiff adequately alleged causation because "it suffices at the pleading stage to allege that the

plaintiff incurred a financial injury upon purchasing a product based on the defendant's

deceptive statements").  The complaints therefore allege an injury-in-fact that is sufficiently

concrete and particularized, fairly traceable to Defendants' conduct, and redressable by the court.

Defendants' other "standing" arguments are not standing arguments at all.  Albertsons

and Supervalu contend that Plaintiffs' injuries are merely conjectural, not concrete, because

"'100% cheese' is *not* what Supervalu's labels promised" and because "Supervalu's labels were

in full compliance with FDA regulations."  Doc. 157 at 18.  Target and ICCO contend that there

is no causation because Plaintiffs "do not allege how or why they formed th[e] belief" that the

products contained only cheese, given that the labels (in Target and ICCO's view) do not make

any such representations when viewed as a whole.  Doc. 164 at 25.  Those arguments are just

merits arguments repackaged as standing arguments.  *See Aurora Loan Servs., Inc. v. Craddieth*,

442 F.3d 1018, 1024 (7th Cir. 2006) ("The point is not that to establish standing a plaintiff must establish that a right has been infringed; that would conflate the issue of standing with the merits of the suit.  It is that he must have a colorable *claim* to such a right.").  Plaintiffs therefore have standing to pursue their claims.

## II.     Merits

### A.     Consumer Protection Claims

Plaintiffs bring claims under various state consumer protection statutes: Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 *et seq.* ("ADPTA"), Doc. 120 at 29-30; Doc. 121 at 11-12; Doc. 123 at 23-25; California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA"), Doc. 120 at 19-20; Doc. 122 at 20-21; Doc. 123 at 27-28; California Unfair Competition Law, Cal. Bus. & Profs. Code § 17200 *et seq.* ("UCL"), Doc. 120 at 17-19; Doc. 122 at 18-20; Doc. 123 at 25-27; Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b ("CUTPA"), Doc. 120 at 26-27; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"), Doc. 120 at 27-29; Doc. 122 at 16-18; Doc. 123 at 20-22, Doc. 143 at 8-10; Illinois Deceptive Practices and Consumer Fraud Act, 815 ILCS 505/2 ("ICFA"), Doc. 120 at 25-26; Doc. 121 at 10-11; Doc. 122 at 13-14; Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903 *et seq.* ("MCPA"), Doc. 120 at 31-32; Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.09 *et seq.* ("MUTPA"), Doc. 120 at 22-23; Doc. 123 at 17-18; Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44 *et seq.* ("MDTPA"), Doc. 120 at 24-25; Doc. 123 at 19-20; Minnesota False Statement in Advertising Act, Minn. Stat. § 325F.67 ("MFSAA"), Doc. 120 at 23-24; Doc. 123 at 18-19; Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68 *et seq.* ("MPCFA"), Doc. 120 at 21-22; Doc. 123 at 15-17; Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*

("MMPA"), Doc. 122 at 14-16; New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 *et seq.*

("NJCFA"), Doc. 123 at 22-23; and New York General Business Law §§ 349, 350 ("NYGBL"),

Doc. 120 at 15-16; Doc. 123 at 14-15.

The parties cite precedents applying these laws interchangeably and agree that, while

they differ in certain particulars, all share a common requirement: to state a claim, a plaintiff

must allege conduct that plausibly could deceive a reasonable consumer. *See*, *e.g.*, Doc. 162 at

16 & n.4 ("The state laws invoked by Plaintiffs require proof that the challenged statement is

likely to mislead a reasonable consumer."); Doc. 185 at 31 & n.14 ("Generally, state consumer

protection claims alleging deceptive trade practices may be satisfied by proof that a statement is

likely to mislead a reasonable consumer."); *see also*, *e.g.*, *Ebner v. Fresh, Inc.*, 838 F.3d 958,

965 (9th Cir. 2016) ("Plaintiff's claims under [UCL and CLRA] are governed by the reasonable

consumer test.") (citation omitted); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755-57 (7th

Cir. 2014) (holding that the question of whether a "reasonable consumer" would likely be

deceived was common to all members of a proposed class that included Alabama consumers

suing under state consumer protection law) (citing *Chrysler Corp. v. Schiffer*, 736 So. 2d 538,

543-44 (Ala. 1999)); *ibid.* (holding the same for New Jersey consumers) (citing *Turf Lawnmower*

*Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 430 (N.J. 1995)); *Fink v. Time Warner*

*Cable*, 714 F.3d 739, 741 (2d Cir. 2013) ("To prevail on their consumer fraud claims under New

York and California law, Plaintiffs must establish that Time Warner's allegedly deceptive

advertisements were likely to mislead a reasonable consumer acting reasonably under the

circumstances."); *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007)

("[D]eception [under the FDUTPA] occurs if there is a representation, omission, or practice that

is likely to mislead the consumer acting reasonably in the circumstances … .") (quoting *PNR*,

11

*Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003)); *In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5-6 (D. Minn. July 12, 2017) (applying the "reasonable consumer" standard when analyzing motion to dismiss a class action complaint asserting violations of the MPCFA, the MDTPA, and other consumer protection laws); *Nelson v. MillerCoors, LLC*, 2017 WL 1403343 (E.D.N.Y. Mar. 31, 2017) ("The reasonable consumer standard applies to [NYGBL] section 349 and 350 claims … ."); *Thornton v. Pinnacle Foods Grp. LLC*, 2016 WL 4073713, at *3 (E.D. Mo. Aug. 1, 2016) (inquiring whether "a reasonable consumer would be deceived by a product label" when examining an MMPA claim); *Smith v. Wells Fargo Bank, N.A.*, 158 F. Supp. 3d 91, 101 (D. Conn. 2016) ("[A] plaintiff can plead a deceptive act or practice [under CUTPA] by establishing … the defendant made a representation, omission, or other practice likely to mislead consumers … [and] the plaintiff, a consumer, interpreted the message reasonably under the circumstances … .") (citing *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990)), *aff'd*, 666 F. App'x 84 (2d Cir. 2016); *Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1031 (Ill. App. 2014) ("[T]he analysis [under the ICFA] must consider whether the act was deceptive as reasonably understood in light of all the information available to plaintiffs.") (emphasis omitted); *Dix v. Am. Bankers Life Assurance Co. of Fla.*, 415 N.W.2d 206, 209 (Mich. 1987) (asking under the MCPA whether "a reasonable person would have relied on" the allegedly deceptive representations); *Curtis v. Philip Morris Cos.*, 2004 WL 2776228, at *4 (Minn. Dist. Ct. Nov. 29, 2004) (holding that under Minnesota consumer protection law, whether marketing is deceptive turns on whether "it has the capacity to mislead consumers, acting reasonably under the circumstances … (i.e. to entice a reasonable consumer to purchase the product)").

Thus, for purposes of state consumer protection statutes, "a statement is deceptive if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001); *see also Ebner*, 838 F.3d at 965 ("Plaintiff[s] must show that members of the public are likely to be deceived.") (internal quotation marks omitted). "Whether an advertisement is misleading must be judged by the effect it would have on a reasonable consumer." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1161 (9th Cir. 2012). So on a motion to dismiss, the question is "whether the allegedly false and misleading statements can be read to create a likelihood of deception or to have the capacity to deceive" a reasonable consumer. *Bober*, 246 F.3d at 938. To clear this bar, there must be "more than a mere possibility that [a] label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner. Rather, the reasonable consumer standard requires a probability that a significant portion of the general consuming public … , acting reasonably in the circumstances, could be misled." *Ebner*, 838 F.3d at 965 (internal quotation marks and citations omitted); *see also Fink*, 714 F.3d at 741 ("To prevail on their consumer fraud claims … Plaintiffs must establish that [the] allegedly deceptive advertisements were likely to mislead a reasonable consumer acting reasonably under the circumstances."); *Zlotnick*, 480 F.3d at 1284 ("[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."). "This standard requires a showing of probable, not possible, deception." *Zlotnick*, 480 F.3d at 1284 (internal quotation marks omitted). Put another way, "a representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." *Davis*, 691 F.3d at 1162 (internal citation omitted).

13

Although a marketing practice's deceptiveness is often a question of fact inappropriate for resolution at the pleading stage, *see ibid.*, "the primary evidence in a false advertising case is the advertising itself," *Williams v. Gerber Prods Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *accord Fink*, 714 F.3d at 742. It therefore "is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink*, 714 F.3d at 741.

The "allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005); *see also Fink*, 714 F.3d at 742 ("[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."); *Tudor v. Jewel Food Stores, Inc.*, 681 N.E.2d 6, 8 (Ill. 1997). This means that the "context of the packaging as a whole" must be considered in evaluating whether deception has occurred. *Williams*, 552 F.3d at 393 n.3; *see also Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995). So even if a statement on a package or advertisement might be ambiguous or unclear in isolation, "the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Fink*, 714 F.3d at 742; *see also Freeman*, 68 F.3d at 290 ("Any ambiguity that [the plaintiff] would read into any particular statement is dispelled by the promotion as a whole.").

These principles yield this rule: Where a plaintiff contends that certain aspects of a product's packaging are misleading in isolation, but an ingredient label or other disclaimer would dispel any confusion, the crucial issue is whether the misleading content is ambiguous; if so, context can cure the ambiguity and defeat the claim, but if not, then context will not cure the deception and the claim may proceed. *Compare Williams*, 552 F.3d at 939 (holding that deceptive marketing claims survived a motion to dismiss where there were "a number of features

14

of the [front of the packaging] … which could likely deceive a reasonable consumer," and a

consumer thus "should [not] be expected to look beyond misleading representations on the front

of the box to discover the truth from the ingredient list"), *and Thornton*, 2016 WL 4073713, at

*3 ("As for Pinnacle's 'ingredient list defense,' the Court finds it plausible that a consumer

might rely on the representation 'Nothing Artificial' without looking at the ingredients … ."),

*and Ackerman v. Coca-Cola Co.*, 2010 WL 2925955, at *17 (E.D.N.Y. July 21, 2010) ("[I]t

seems clear that such an impression was precisely what defendant intended to convey. If that

were not the case, it is difficult to understand what defendant had in mind. Accordingly, I cannot

conclude as a matter of law that the statements could not have been reasonably relied on by

consumers.") (citation omitted), *with Bober*, 246 F.3d at 939 (holding that, although the

defendants' marketing statements were open to misinterpretation, the plaintiff failed to state a

claim because other information available to consumers would "dispel[] any tendency to deceive

that the statements at issue might otherwise have had"), *and Freeman*, 68 F.3d at 290 ("Any

ambiguity that Freeman would read into any particular statement is dispelled by the promotion as

a whole."), *and Workman v. Plum Inc.*, 141 F. Supp. 3d 1032, 1035 (N.D. Cal. 2015) (holding

that, where "a reasonable consumer would simply not … assume that the size of the items

pictured [on the front of a package] directly correlated with their predominance [in the product],"

and where "any potential ambiguity could be resolved by the back panel of the products," the

packaging was not deceptive).

      In other words, while a reasonable consumer, lulled into a false sense of security by an

unavoidable interpretation of an allegedly deceptive statement, may rely upon it without further

investigation, *see Williams*, 552 F.3d at 939 (depicting certain fruits prominently on a product

called "fruit juice snacks" was deceptive, where neither "those fruits [n]or their juices [we]re

contained in the product," even though the ingredient list accurately revealed the product's ingredients), consumers who interpret ambiguous statements in an unnatural or debatable manner do so unreasonably if an ingredient label would set them straight, *see McKinnis v. Kellogg USA*, 2007 WL 4766060, at *3-5 (C.D. Cal. Sept. 19, 2007) (holding that a reasonable consumer would check the ingredient list to determine whether there was actual fruit in "Froot Loops" breakfast cereal, where the product's allegedly misleading characteristics included the "fanciful" word "F-R-O-O-T" in its name, depictions of "ring-shaped cereal resembling fruit" and "illustrations of fruit surrounding [a] banner stating 'NATURAL FRUIT FLAVORS,'" but not any "specific affirmation" that the product contained actual fruit). This distinction rests on the principle that, when product descriptions are merely vague or suggestive, "[e]very reasonable shopper knows the devil is in the details." *Workman*, 141 F. Supp. 3d at 1035. Indeed, Plaintiffs concede that an "ingredient list … may … clarify potential ambiguities" under the reasonable consumer standard. Doc. 185 at 20.

Turning to the present suits, the description "100% Grated Parmesan Cheese" is ambiguous—as are the other, similar descriptions of Defendants' products—so Plaintiffs' claims are doomed by the readily accessible ingredient panels on the products that disclose the presence of non-cheese ingredients. Although "100% Grated Parmesan Cheese" *might* be interpreted as saying that the product is 100% cheese and nothing else, it also might be an assertion that 100% of the cheese is parmesan cheese, or that the parmesan cheese is 100% grated. Reasonable consumers would thus need more information before concluding that the labels promised only cheese and nothing more, and they would know exactly where to look to investigate—the ingredient list. Doing so would inform them that the product contained non-cheese ingredients. *See Williams*, 552 F.3d at 939-40 ("[R]easonable consumers expect that the ingredient list

contains more detailed information about the product … ."); *Workman*, 141 F. Supp. 3d at 1035 (same); *McKinnis*, 2007 WL 4766060, at *4 ("[T]he side panel lists all of the ingredients, which do not include fruit.  Plaintiffs cannot claim surprise over these labels, which have long been required on food products and are familiar to a reasonable consumer.").  Defendants' labeling and marketing, when viewed as a whole, thus are not deceptive.

Plaintiffs take a different view, casting this case as one about "affirmative misrepresentations," not ambiguous statements.  Doc. 185 at 34.  But, as noted, there are at least three reasonable ways to interpret "100% Grated Parmesan Cheese"—and Plaintiffs' nothing-but-cheese reading is, in context, the weakest of the three.  The products are packaged and shelf-stable at room temperature, a quality that reasonable consumers know is not enjoyed by pure cheese.  Cheese is a dairy product, after all, and reasonable consumers are well aware that pure dairy products spoil, grow blue, green, or black fuzz, or otherwise become inedible if left unrefrigerated for an extended period of time.  *See Veal v. Citrus World, Inc.*, 2013 WL 120761, at *4 n.4 (N.D. Ala. Jan. 8, 2013) ("The plaintiff makes much ado about believing the packaged containers of orange juice contained 'fresh squeezed' orange juice.  As a matter of common sense, whatever is in a container on a store shelf with an expiration date some weeks hence cannot contain 'fresh' anything.  Even if the product began its life as 'fresh squeezed orange juice,' common sense dictates that by the time the same makes its way to a grocery store and sits on a shelf waiting purchase, it is no longer 'fresh.'"); *Red v. Kraft Foods, Inc.*, 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012) ("Plaintiffs' theory of the case is that the packaging suggests the product is *healthy* and contains a *significant amount* of vegetables, because the packaging boasts that the crackers are made with real vegetables and depicts vegetables.  The fact remains that the product is a box of crackers, and a reasonable consumer will be familiar

with the fact of life that a cracker is not composed of primarily fresh vegetables.") (internal quotation marks omitted).

Plaintiffs protest that "there is no contention that cellulose has anything to do with the Products' shelf life or that a reasonable consumer should be expected to know whether or not cellulose is connected to shelf life," Doc. 185 at 35, and that reasonable consumers cannot be expected to understand "intricacies relating to the shelf life and processing of" grated cheese, *id.* at 36. All of that is beside the point. It does not matter whether reasonable consumers would expect to find *cellulose* (or any other specific additive) in a container of unrefrigerated, shelf-stable cheese; they would still suspect that *something* other than cheese might be in the container, and so would turn it around, enabling them to learn the truth from a quick skim of the ingredient label. *See Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 758 (N.D. Ill. 2015) ("Even though a reasonable consumer may not understand everything that happens to sugar cane before its derivative can be added as an ingredient in Vanilla Blueberry Clusters, a reasonable consumer would know that all sugar cane-derived sweeteners suitable for human consumption must be at least partially refined.").

In pressing the contrary result, Plaintiffs rely primarily on two cases. Both are distinguishable. In *Williams v. Gerber Products Co.*, the plaintiffs alleged deceptive marketing of fruit snacks for toddlers. 552 F.3d at 936. As relevant here, they claimed that the "use of the words 'Fruit Juice' juxtaposed alongside images of fruits such as oranges, peaches, strawberries, and cherries" was deceptive because the snacks contained no juice from any of those fruits and instead only white grape juice from concentrate; they further alleged that the statement "made 'with real fruit juice and other all natural ingredients'" was deceptive because "the two most prominent ingredients were corn syrup and sugar." *Ibid*. The Ninth Circuit held that those

allegations sufficed to state a claim, observing that the product's label "potentially suggest[ed] *(falsely)* that [the prominently pictured] fruits or their juices were contained in the product," and concluding that because the "all natural ingredients" statement "could easily be interpreted by consumers as a claim that all the ingredients in the product were natural, *which appears to be false*," a reasonable consumer might be deceived even though the ingredient label was accurate. *Id*. at 939 (emphases added). Key to the Ninth Circuit's conclusion was that the allegedly deceptive term "Fruit Juice" on the front of the package was an affirmatively false impression; there was no ambiguity. *Ibid*. ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list … ."); *see also Ebner*, 838 F.3d at 966 ("Stated straightforwardly, *Williams* stands for the proposition that *if* the defendant commits an act of deception, the presence of fine print revealing the truth is insufficient to dispel that deception."). Here, by contrast, Defendants' "100%" assertion is ambiguous, rendering *Williams* inapposite. *See Workman*, 141 F. Supp. 3d at 1036-37 (distinguishing *Williams* as "limited to affirmative misrepresentations"); *Manchouck v. Mondelez Int'l Inc.*, 2013 WL 5400285 at *3 (N.D. Cal. Sept. 26, 2013) (same).

It bears mention that additional contextual factors in *Williams* weighed in favor of finding deception. As the Ninth Circuit noted, the plaintiffs there alleged that they "sought healthy snacks for their children (ages two and three)" and "trusted the Gerber name," and thus "the claim that [the product] is 'just one of a variety of nutritious Gerber Graduates foods and juices that have been specifically designed to help toddlers grow up strong and healthy' adds to the potential deception." *Williams*, 552 F.3d at 936, 939. Here, given the cheese products' shelf-stability, context and common sense weigh in the opposite direction. *See Red*, 2012 WL

5504011, at *3 ("[A] number of courts have dismissed [UCL] claims as a matter of law post-*Williams*, especially where … the claim alleges that a consumer will read a true statement on a package and will then disregard well-known facts of life and assume things about the products *other than* what the statement actually says.") (internal quotation marks omitted).

Plaintiffs' second principal authority, *Gubala v. CVS Pharmacy, Inc.*, 2016 WL 1019794, (N.D. Ill. Mar. 15, 2016), does not help them either because it, too, involved an unambiguous misrepresentation. The alleged misleading statement in *Gubala* was clear; the product was called "Whey Protein Powder" and promised "26 grams of high-quality protein" on the label, but it actually contained 21.8 grams of whey protein and 4.2 grams of "free form amino acids and other non-protein ingredients, which are cheaper and less nutritionally beneficial." *Id.* at *1. The court held that the alleged "use of the term 'protein' to include both actual protein and non-protein substances" created "a disputed issue of fact whether the Product name is misleading in that it suggests that the protein in the Product is comprised exclusively of pure whey protein." *Id.* at *12. So the challenged statement in *Gubala* had a clear, specific import that was false, because "protein" unambiguously does not include "non-protein ingredients." *See ibid.* (likening the facts of *Gubala* to another case in which the plaintiffs "sufficiently alleged that the collective effect of the challenged statements was to mislead a reasonable consumer"). As discussed, the same is not true of "100% Grated Parmesan Cheese."

## B. Express Warranty Claims

Plaintiffs' express warranty claims suffer from the same fatal flaw as their consumer protection claims: A reasonable consumer would not understand Defendants' labels to warrant that the products contain only cheese. As the parties agree, the express warranty claims can succeed only if a "reasonable consumer could plausibly read [Defendants' statements] to be

specific, factual representations that the products contain" solely cheese, but must fail if the labels, viewed objectively, make no such promise. Doc. 185 at 45 (quoting *Bohac v. Gen. Mills Inc.*, 2014 WL 1266848, at *9 (N.D. Cal. Mar. 26, 2014)); *see also*, *e.g.*, *id.* at 44-45 (Plaintiffs arguing, in opposition to dismissal of the express warranty claims, that "*a reasonable buyer* would be justified in relying on [the alleged cheese-only promise] … in navigating the marketplace," and that "[p]laintiffs and other consumers *reasonably understood* these statements to mean the Products were 100% cheese") (internal quotation marks omitted) (emphases added); Doc. 157 at 29-30 (Albertsons and Supervalu arguing that "Plaintiffs cannot ignore the express and unambiguous statement on the labels that the grated cheese products include cellulose as an anticaking agent and claim a conflicting *subjective interpretation or expectation* that the products contained 'all cheese'") (emphasis added); Doc. 164 at 27 (ICCO and Target arguing that "no defendant can be liable for warranties that they did not make, and that are based upon *subjective interpretations* that ignore the ingredient list on the Products' labels.") (emphasis added). In other words, the question is whether Plaintiffs' (alleged) subjective belief that the products promised only cheese was objectively reasonable, and for the reasons given above, the answer is no. Defendants' express warranty claims thus fall along with their consumer protection claims. *See Bohac*, 2014 WL 1266848, at *9 (holding that express warranty claims, like consumer protection claims, can succeed only where "a reasonable consumer could plausibly read [the terms at issue] to be specific factual representations that the products contain no non-natural ingredients").

This conclusion follows from the basic contract principles that govern express warranty claims. *See*, *e.g.*, *Burns v. Winnebago Indus., Inc.*, 492 F. App'x 44, 48 (11th Cir. 2012) ("Florida courts generally treat warranties like contracts … .") (collecting cases); *Loeffel Steel*

*Prods., Inc. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 983 (N.D. Ill. 2005) ("Express warranties are contractual in nature … ."); *Ex parte Miller*, 693 So. 2d 1372, 1376 (Ala. 1997) ("Express warranties should be treated like any other type of contract and interpreted according to general contract principles.").  Those principles require courts to look to the entire contract—or, for an express warranty claim, product label—and construe ambiguous terms in light of the document as a whole.  *See Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 529 (7th Cir. 2005) (holding that a contract term should be interpreted "in light of the contract as a whole" to resolve its "apparent ambiguity" when "viewed out of context").  As explained above, a reasonable consumer would not understand "100% Grated Parmesan Cheese" to warrant that the product contains only cheese without first inspecting the ingredient list, because "100% Grated Parmesan Cheese" is ambiguous.  *See Chin v. Gen. Mills, Inc.*, 2013 WL 2420455, at *7 (D. Minn. June 3, 2013) (holding that express warranty claims under New York and New Jersey law failed because "'100% Natural' cannot be viewed in isolation and must be read in the context of the entire package, including the ingredient panel"); *Specialized Mach. Transp., Inc. v. Westphal*, 872 So. 2d 424, 426 (Fla. App. 2004) ("[T]he meaning is not to be gathered from any one phrase, but from a general view of the whole writing, with all of its parts being compared, used, and construed, each with reference to the others.").  That defeats Plaintiffs' express warranty claims as a matter of law.

## C.    Implied Warranty of Merchantability Claims

Plaintiffs' implied warranty of merchantability claims fail for the same reason: Defendants' labels cannot reasonably be read to promise that the products contain only cheese. Defendants argue that because their products were fit for ordinary use as grated cheese, they breached no implied warranty of fitness.  Doc. 162 at 33-34; Doc. 164 at 27; *see also* Doc. 168 at

22-23 ("The Complaint lacks any allegation suggesting that the Products were not fit for their ordinary purpose or could not be consumed or used as grated Parmesan cheese."); Doc. 174 at 18 ("[T]he grated cheese was of merchantable quality and fit to consume as grated cheese."). Plaintiffs' sole response is that the products "do not conform to the promise made on their label that they are 100% cheese," citing several cases that refuse to dismiss implied warranty claims concerning food products that, while edible, fell short of promises on their labels. Doc. 185 at 50; *see also id*. at 50-51 ("Plaintiffs paid for '100%' cheese and received a product that was comprised partially of non-cheese filler and thus not merchantable *as such*.") (emphasis added).

Even assuming Plaintiffs are correct that making a specific promise and then failing to satisfy it could breach the implied warranty of merchantability even though the product is otherwise fit for ordinary use—an arguable proposition, *see Ackerman*, 2010 WL 2925955, at *25 ("A warranty of merchantability … does not mean that the product will fulfill a buyer's every expectation but rather simply provides for a minimum level of quality.") (internal quotation marks omitted)—the labels here make no promise that the product consists of cheese only. It follows that Plaintiffs' implied warranty claims fail, too. *See Sugawara v. Pepsico, Inc.*, 2009 WL 1439115, at *5 (E.D. Cal. May 21, 2009) (holding that "because the Product packaging was not misleading or deceptive … Plaintiff received exactly what was described on the box," and so failed to state an implied warranty claim).

### D. Unjust Enrichment Claims

Although the parties skirmish over the particularities of various States' unjust enrichment laws, Plaintiffs acknowledge that, generally speaking, "[t]o state a cause of action based on the theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates

fundamental principles of justice, equity, and good conscience." Doc. 185 at 51. Plaintiffs' only basis for asserting that Defendants' marketing violated principles of justice, equity, and good conscience is their contention that "Defendants marketed their Products as '100%' grated cheese" while delivering something less, and so "deceived" them. *Ibid.*

For the reasons set forth above, that is not a reasonable characterization of Defendants' conduct. No reasonable consumer would think Plaintiffs delivered something other than what their labels promised. So Plaintiffs' unjust enrichment claims fail, too. *See Bober*, 246 F.3d at 943 ("[I]n the absence of any deception on the part of the defendants, the requisite violation of 'fundamental principles of justice, equity, and good conscience' is not present."); *Girard v. Toyota Motor Sales, U.S.A., Inc.*, 316 F. App'x 561, 563 (9th Cir. 2008) (holding that the plaintiff's "unjust enrichment claim also fails since [the defendant's] non-deceptive advertising does not entitle [the plaintiff] to restitutionary relief"); *Hillen v. Blistex, Inc.*, 2017 WL 2868997, at *4 (N.D. Ill. July 5, 2017) ("Plaintiff's failure to plead any actionable deception eviscerates not only her fraud claims but her unjust enrichment claim as well. … I agree with defendant that because it sells all of the ointment it claims to … it was not unjustly enriched by plaintiff's purchases of the product.") (internal quotation marks and citations omitted); *Storey v. Attends Healthcare Prod., Inc.*, 2016 WL 3125210, at *13 (E.D. Mich. June 3, 2016) (holding under Michigan law that the plaintiffs could not succeed on their unjust enrichment claim because they had "not established that it would be inequitable for Defendant to retain the benefit that Plaintiffs (indirectly) conferred on Defendant," where they did not "set forth facts that would make plausible their conclusory allegations" that a product was unsafe and, as such, "the Court [could not] conclude that Plaintiffs did not get what they paid for"); *cf. Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 290-91 (S.D.N.Y. 2014) (holding under New York law that, where

"Plaintiffs claim that they purchased Smart Balance because of Defendants' purported misrepresentations," "if [their] other claims are defective, an unjust enrichment claim cannot remedy the defects") (internal quotation marks omitted).

## Conclusion

For the foregoing reasons, Defendants' motions to dismiss are granted. The complaints are dismissed without prejudice to Plaintiffs' filing amended complaints that attempt to correct the deficiencies identified above. *See Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). Plaintiffs have until September 14, 2017 to amend their complaints. If they do not do so, the dismissals will convert automatically to dismissals with prejudice, and judgment will be entered. If Plaintiffs amend their complaints, Defendants shall answer or otherwise plead by October 5, 2017.

August 24, 2017

_____
United States District Judge